UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VICTORIA SANCHEZ | * | CIVIL ACTION NO. 12-CV-00164 |
| | * | |
| V. | * | SECTION J(2) |
| | * | |
| AMERICAN POLLUTION CONTROL CORP. | * | JUDGE BARBIER |
| | * | MAG. JUDGE CURRAULT |

### ORDER & REASONS

Before the Court is American Pollution Control Corp.'s ("AMPOL") Motion for Summary Judgment against the claims of Victoria Sanchez ("Sanchez"). (Rec. Doc. 164).[1] The overarching issue is whether Sanchez is a "seaman" under the Jones Act. For the reasons explained below, the Court denies most of AMPOL's motion because there is a genuine factual dispute concerning Sanchez's reassignment from onshore to offshore work. The Court partially grants the motion with respect to Sanchez's unseaworthiness claim, as Sanchez has abandoned that claim with respect to AMPOL.

### I.   BACKGROUND

This action arose in the context of the response to the massive oil spill in the Gulf of Mexico following the DEEPWATER HORIZON/Macondo Well casualty on April 20, 2010. Numerous companies and tens of thousands of individuals participated in the effort to contain, mitigate, and remove oil. Defendant AMPOL is an environmental remediation company that participated in the response. A relevant

---

[1] Related briefing: Sanchez Opp'n, Rec. Doc. 167; AMPOL Reply, Rec. Doc. 170; Sanchez Sur-Reply, Rec. Doc. 171.

aspect of the response was the "Vessels of Opportunity" program, where local fishing vessels were hired to assist with the response.

Plaintiff Victoria Sanchez was employed by AMPOL for 23 days during the summer of 2010. Her job title was "Hazardous Material Technician." Although Sanchez's job title never changed during her employment, her work assignments did.

Sanchez spent the first 17 days working on land at AMPOL's operations base in Venice, Louisiana. Her jobs during this time included picking up trash, digging holes, moving cinderblocks, and loading and unloading boats at AMPOL's dock. Sanchez spent each of the last 6 days of her employment working on NO GAS II, a 27-foot shrimp or oyster boat that was part of the Vessels of Opportunity program.[2] The vessel's mission during this time was to deploy and retrieve boom, used to contain or absorb oil on the surface of the water. Sanchez's primary job on NO GAS II was to handle boom. She would meet the vessel around dawn at AMPOL's dock, travel with the vessel to one location where it was loaded with boom, help load and stow the boom, ride the vessel to another location, help deploy the boom, and so forth. After 11-12 hours of work, NO GAS II would return to AMPOL's dock where Sanchez would help remove trash from the vessel before disembarking and signing out for the day. Sanchez slept onshore at the Venice operations base.

Sanchez was allegedly injured on July 13, 2010, her sixth consecutive day of working on NO GAS II. According to her deposition testimony, she was on her knees tying one piece of boom to another when a large wave hit the boat. Sanchez claims

---

[2] NO GAS II was not owned by AMPOL. NO GAS II was owned by Leroy Jones, its captain, and it was chartered by BP. (*See* Master Vessel Charter Agreement, Rec. Doc. 167-12).

she was tossed in the air and landed hard on her side. A second wave tossed her again, and she landed on her back. (Sanchez Depo. at 206:7-22, Rec. Doc. 167-4). Sanchez claims she was fired later that evening. (Sanchez Depo. at 242:17-18).

In 2012, Sanchez sued AMPOL and other defendants for her injuries under the Jones Act, 46 U.S.C. § 30104, as well as for unseaworthiness and maintenance and cure under general maritime law. (Fourth Am. Compl., Rec. Doc. 61). Her case was consolidated with Multidistrict Litigation No. 2719 and stayed. (Rec. Doc. 122). In 2019, the Court severed this case from the MDL and lifted the stay. (Rec. Doc. 128). After some discovery, AMPOL filed the instant motion for summary judgment. (Rec. Doc. 164).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If, as here, the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075.

### III.  DISCUSSION

#### A.  Seaman Status

AMPOL contends that there is no genuine dispute that Sanchez is not a seaman; therefore, it is entitled to judgment as a matter of law against her Jones Act claim.

The Jones Act grants a "seaman" a cause of action in negligence against her employer for injuries incurred in the course of her employment. 46 U.S.C. § 30104 (incorporating 45 U.S.C. § 51). The Supreme Court has characterized the essential requirements for seaman status as twofold. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). "First, . . . an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Id.* (cleaned up). "[T]his threshold requirement is very broad: All who work at sea in the service of a ship are *eligible* for seaman status." *Id.* (cleaned up; emphasis in original). "Second, . . . a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.* "The fundamental

4

purpose of this substantial connection requirement is to . . . separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* (citation omitted).

There is no dispute that the NO GAS II was a vessel in navigation. There is also no dispute that Sanchez's work contributed to the function of that vessel and to the accomplishment of its mission. As is often the case, the parties' disagreement centers on whether Sanchez's connection to the NO GAS II was "substantial."

### B. "Substantial in Duration"

There are two facets to the substantial connection requirement: duration and nature. Both must be satisfied. *Id* at 371. As to duration, there is a "rule of thumb" that a worker who spends less than 30% of her employment time in the service of a vessel is not a seaman. *Id.* AMPOL contends that Sanchez does not pass this threshold, as she spent only 26% of her employment time—6 out of 23 days—working on NO GAS II. Sanchez, however, contends that her reassignment to NO GAS II constituted a permanent and fundamental change of status; therefore, the seaman status inquiry should consider only the last 6 days of her employment. Sanchez asserts, then, that she spent 100% of the relevant employment period—6 out of 6 days—working on a vessel in navigation. She similarly claims that had she not been injured, she would have continued to work on the NO GAS II for several more months such that she would have far exceeded the 30% guideline, even if the first 17 days of her employment are counted.

Sanchez's argument invokes what is sometimes called the "change-of-assignment" exception. *See Gage v. Canal Barge Co.*, 431 F. Supp. 3d 754, 762 (M.D. La. 2020) (citing David W. Robertson & Michael F. Sturley, *Recent Developments in Admiralty and Maritime law at the National Level and in the Fifth and Eleventh Circuits*, 36 TUL. MAR. L.J. 425, 489-90 (2012)). Typically, the seaman status inquiry considers the overall course of the worker's employment with a particular employer. *Chandris*, 515 U.S. at 371-72. However, the Supreme Court recognized that this is not always appropriate. "If a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position." *Id.* at 372.

> For example, we can imagine situations in which someone who had worked for years in an employer's shoreside headquarters is then reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel. Such a person should not be denied seaman status if injured shortly after the reassignment, just as someone actually transferred to a desk job in the company's office and injured in the hallway should not be entitled to claim seaman status on the basis of prior service at sea.

*Id.*

The Fifth Circuit has cautioned against applying this exception in a way that would supplant *Chandris*'s status-based test with a "snapshot" or "voyage" test.[3]

---

[3] *See Becker v. Tidewater, Inc.*, 335 F.3d 376, 389-90 (5th Cir. 2003) ("This exception, however, creates a potential problem: any worker who works intermittently on vessels in navigation and who sustains an injury in the course of doing so will claim seaman status if he is injured while at sea. For instance, a worker whose duties sometimes take him to sea could claim that the start of each voyage establishes a reassignment to a sea-based position and that his return to shore again shifts his status back to a land-based worker. It appears that the Supreme Court [in *Chandris*] attempted to preempt such

Thus, "merely serving ***an*** assignment on a vessel in navigation does not alter a worker's status"; rather, the reassignment must amount to what *Becker* variously referred to as a "substantial," "fundamental," and/or a "permanent" change in status. 335 F.3d at 389-90 (emphasis added); *see also Gage*, 431 F. Supp. at 762-63 & 766 (noting that it is unclear whether *Becker* requires that the reassignment be "permanent" in addition to "substantial" and "fundamental").

AMPOL characterizes Sanchez as a land-based employee who was temporarily assigned to a vessel. It relies on an affidavit from Roger Guerra, an AMPOL project manager, who testified that Sanchez's assignment to NO GAS II was "temporary," and that Hazardous Material Technicians like Sanchez were subject to reassignment on a daily basis depending on the needs of the response. (Guerra Aff. ¶¶ 3-4, Rec. Doc. 164-9).[4] AMPOL also relies on an affidavit from Kirk Headley, AMPOL's president, who testified that "each day is a temporary job assignment for HMTs and no assignment is permanent. . . . On the BP spill, an HMT like Victoria Sanchez was subject to re-assignment depending upon the progress of the cleanup, the needs of the customer, and the operations planned for that particular day. A re-assignment to land-based or sea-based activities was possible . . . ." (Headley Aff. ¶ 3, Rec. Doc. 164-7).[5]

Sanchez argues that there is evidence to show that her reassignment to the NO GAS II was permanent such that, but for her injury, she would have continued

---

arguments by specifically rejecting a 'voyage test' of seaman status under which a worker could 'walk into and out of coverage in the course of his regular duties.'" (citation omitted)).

[4] Guerra provided similar testimony at his deposition. (*See, e.g.* Guerra Depo. at 17:20-25, 45:13-14 ("[N]obody was permanently assigned to any of the boats down at the docks.")).

[5] Headley provided similar testimony at his deposition. (*See, e.g.*, Headley Depo. at 36:20-21 to 37:5).

as a member of the NO GAS II's crew until it completed its remediation mission several months later. Sanchez submitted a declaration under penalty of perjury wherein she testified that "I was approached by AMPOL supervisor Carl Neukrich and told that I was being reassigned to offshore duty" and that other AMPOL supervisors explained to her "that the rule was that reassignment to offshore duty was permanent: if you worked on the dock you stayed on the dock and if you worked on the boat you could not return to the dock." (Sanchez Decl. ¶¶ 4-5, Rec. Doc. 167-3). Sanchez further testified that "[m]y AMPOL supervisors told me that my services were needed offshore, so I agreed to the reassignment despite knowing that I would not be able to return to the dock." (Sanchez Decl. ¶ 5).[6]

Sanchez also points out that neither Roger Guerra nor Kirk Headley provided work assignments to her, nor do they know exactly what she was told regarding her assignment to the NO GAS II. Their testimony was based on their knowledge of how operations generally occurred at the Venice facility. (*See, e.g.*, Guerra Depo. at 22:4 to 23:13; 30:7-8; Headley Depo. at to 45:12 to 47:10). Sanchez further notes that once she was assigned to the NO GAS II on July 8, she worked exclusively on that vessel

---

[6] The record also contains a typed statement that Sanchez allegedly created several months after her injury. (Rec. Doc. 167-11; *see also* Sanchez Depo. at 50-51 (describing the statement)). According to this statement:

> July 8th was my first day out on the boat. I started out the morning working on the dock—then I was approached by an Ampol supervisor, Carl Neukrich in Division II. He told me they were short-handed and said I was needed to go out on the boats . . . but then one of the [foremen] from U.S.A made the comment that Doug [a dock supervisor with U.S.E.S.] has just passed a rule that if you work the dock you stay on the dock and if you go out on the boat you cannot return to the dock. I was told by my Ampol supervisors that Ampol pays my check not U.S.E.S. and I needed to be with the rest of my coworkers so I went on the boat knowing I would not be[ ]able to return to the dock.

(Rec. Doc. 167-11 at 1-2).

8

until she was injured on July 13, and the three people working on that vessel (the captain, the captain's assistant, and another AMPOL employee) remained the same while she was assigned to it. (Sanchez. Decl. ¶ 6). Sanchez argues these facts support her contention that her assignment to the vessel was permanent.

Considering the evidence in the summary judgment record, the present legal standard, and the law regarding seaman status, the Court finds there are material issues of fact as to whether Sanchez's reassignment to the NO GAS II was sufficient to trigger the "change-of-assignment" exception. Although AMPOL's president and project manager testified that Sanchez's assignment to the NO GAS II was only temporary and subject to future reassignment, they do ***not*** state that Sanchez would not have continued to serve on the NO GAS II had she not been injured. Sanchez, as the non-mover, is entitled to have all reasonable inferences drawn in her favor. There is no dispute that Sanchez worked exclusively on shore until she was assigned to work on the NO GAS II, at which point she worked exclusively on that vessel for each of the next six days until she was injured. There is also no dispute that the varied tasks Sanchez performed onshore were fundamentally different from the boom-handling work she engaged in while on the vessel. This "clean break" in assignments and concomitant duties is consistent with Sanchez's claim that her reassignment was permanent and her status changed. There is also no dispute that the other AMPOL worker assigned to the NO GAS II remained the same while Sanchez worked on the vessel, which is consistent with Sanchez's statement that "the rule was that reassignment to offshore duty was permanent: . . . if you worked on the boat you could

not return to the dock."[7] She also presents evidence that suggests the NO GAS II continued to perform its remediation work until November 26, 2010, several months after she was injured. (*See* Notice of Non-renewal of Master Vessel Charter, Rec. Doc. 167-14). Considering all of this, Sanchez is entitled to the reasonable inference that, but for her injury, she would have worked exclusively on the NO GAS II for several months. If this inference is correct—meaning, hypothetically, if Sanchez had not been injured and continued to work on the NO GAS II until late November—then the fact that AMPOL considered her reassignment to be "temporary" becomes irrelevant to the "substantial in duration" inquiry, as she would have spent the vast majority of her employment time working on a vessel.[8]

On a related note, AMPOL's motion essentially asks the Court to weigh the evidence and find that its witnesses are credible and Sanchez is not, which the Court generally cannot do on summary judgment.

### C.   "Substantial in Nature"

The second facet of the connection inquiry requires that the employee-vessel

---

[7] The current record is silent as to whether this worker was assigned to the NO GAS II before or after Sanchez worked on the vessel. This evidence could be probative of Sanchez's status. If, for example, this worker remained assigned to the NO GAS II after Sanchez's employment ended, then that might indicate that Sanchez would have continued to work on that vessel had she not been injured.

[8] At one point the *Becker* decision states, "If we are to be persuaded by this theory, we would need to conclude that (i) when plaintiff was assigned to the REPUBLIC TIDE, he was removed from his former position of land-based intern and assigned to a new, sea-based position, (ii) this reassignment permanently changed his status, and (iii) by serving in this new position, plaintiff would spend at least 30% of his time aboard a vessel." *Becker*, 335 F.3d at 390. Similar to the hesitancy expressed in *Gage*, 431 F. Supp. at 762-63 & 766, it is not clear to this Court whether *Becker* intended this passage to establish a definitive, three-part test for the change-of-assignment exception or whether it is "loose language" that sometimes adorn admiralty decisions. *See* David W. Robertson, *The Supreme Court's Approach to Determining Seaman Status: Discerning the Law Amid Loose Language and Catchphrases*, 34 J. MAR. L. & COM. 547, 549 (2003), *cited with approval in Sanchez v. Smart Fabricators of Tex., L.L.C.,* No. 19-20506, 2021 WL 1882565 at *9, -- F.3d -- (5th Cir. May 11, 2021) (Dennis, J., concurring). If *Becker* did in fact set forth a three-part test, then the Court concludes for essentially the same reasons provided above that there is a factual dispute as to whether it is met.

connection be "substantial in nature." *Chandris*, 515 U.S. at 371. Last month, the Fifth Circuit issued a unanimous, en banc decision that overhauled its precedents regarding this element. *See Sanchez v. Smart Fabricators of Texas, L.L.C.*, No. 19-20506, 2021 WL 1882565, -- F.3d -- (5th Cir. May 11, 2021) (en banc).[9] Prior to *Smart Fabricators*, some cases evaluated the nature element by asking only or primarily whether the plaintiff was subject to the "perils of the sea." *See id.* at *6 (citing *Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927 (5th Cir. 2015); *In re Endeavor Marine, Inc.*, 234 F.3d 287 (5th Cir. 2000)). *Smart Fabricators* held this was incorrect because, while exposure to sea perils is relevant, "it is not the sole or even the primary test." *Id.* Drawing from the Supreme Court's seaman status cases, *Smart Fabricators* set out additional questions for courts to consider:

> (1) Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?
>
> (2) Is the work sea-based or involve seagoing activity?
>
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Id.* at *7 (footnote omitted).[10]

*Smart Fabricators*'s application of these criteria provides further guidance.

---

[9] Despite the similar title, *Sanchez v. Smart Fabricators of Texas, L.L.C.* is unrelated to the case at bar. To avoid confusion, this Order & Reasons will refer to the Fifth Circuit's decision as "*Smart Fabricators*," rather than *Sanchez*.

[10] Accordingly, *Smart Fabricators* overruled *Naquin, supra*, in its entirety. It also partially overruled *Endeavor Marine, supra*, insofar as that decision used "perils of the sea" as the sole criterion to evaluate the nature element. However, the court left intact *Endeavor Marine*'s conclusion that the plaintiff in that case (a crane operator on a derrick barge that was typically moored at a dock in the Mississippi River) is a seaman, because his connection to the vessel would likely satisfy *Smart Fabricators*'s reformulated analysis of the nature element. *Id.* at *6.

11

Gilbert Sanchez (hereinafter "Gilbert," to avoid confusion with the plaintiff in this case) was a welder employed by SmartFab, a welding and steel fabrication firm. *Id.* at *1. SmartFab was contracted by Enterprise Offshore to perform repairs to two of its jackup rigs. *Id.* One of the vessels was jacked-up next to a dock in Texas, only "a gangplank away from shore" (the "nearshore rig"). *Id.* Gilbert spent around 72% of his employment time with SmartFab working on the nearshore rig. *Id.* The other rig was located miles offshore, jacked-up on the outer continental shelf (the "offshore rig"). *Id.* Gilbert spent around 19% of his employment time on the offshore rig. *Id.* Combined, Gilbert spent around 91% of his employment time on this fleet of vessels; however, his "entire time aboard . . . was spent doing discrete welding jobs as part of repairs to the two vessels." *Id.* at *7.

Gilbert was injured while aboard the offshore rig and sued SmartFab under the Jones Act. The only issue before the Fifth Circuit was whether Gilbert's connection to Enterprise Offshore's vessels was substantial in nature; all other elements of seaman status were met. As to the nearshore rig, the court held that Gilbert failed the nature test because his work on that rig was not "sea-based." *Id.* at *8. Relying heavily on *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548 (1997) (holding that a worker hired to paint a tugboat while it was moored at a dock was not a seaman), the Circuit explained that the dockside repair job did not "take [Gilbert] to sea," was not "of a seagoing nature" or constitute "seagoing activity," and "he was not going to sail with the vessel after he finished his work." *Id.* at *8.

As to Gilbert's work on the offshore rig, *Smart Fabricators* appears to conclude that this assignment satisfied the sea-based/seagoing-activity factor. *See id.*

Nevertheless, the court found that Gilbert's connection to the offshore rig was not substantial in nature based on the third enumerated factor (Is the assignment limited to a discrete task after which the worker's connection to the vessel ends? vs. Does the assignment include sailing with the vessel from place to place?):

> [Gilbert's] work on the [offshore rig], even though it was located on the [outer continental shelf], was work performed on a discrete, individual job. When he and the SmartFab crew were finished, [Gilbert] would have no further connection to the vessel.
>
> Our case law reveals generally that two types of workers are found on drilling rigs. First, we have the drilling crew, who conduct the drilling operations (and workers who support that activity) and stay with the vessel when it moves from one drilling location to another. These workers are the members of the crew of the vessel and are seamen. The second group are specialized transient workers, usually employed by contractors. These workers are engaged to do specific discrete short-term jobs. Discrete transient jobs are like the work done by longshoremen when a vessel calls in port. As stated in *Papai* these workers have only a "transitory or sporadic" connection to a vessel or group of vessels and do not qualify for seaman status. [Gilbert], as a transitory worker, falls into the second group, and thus does not satisfy the nature test.

*Id.* at *8-9 (footnotes omitted). Consequently, the court held that Gilbert's connection was not "substantial in nature" and, therefore, he was not a seaman. *Id.* at *9.

Below the Court applies *Smart Fabricators*'s questions to the case at bar, although in a different order than recited by the Fifth Circuit.

1. <u>"Is the work sea-based or involve seagoing activity?"</u>

*Smart Fabricators* and *Papai* make clear that performing maintenance or repairs to a vessel while it is moored or jacked-up next to a dock is not "sea-based" work, nor does it constitute "seagoing activity." *Id.* at *8 (citing *Papai* 520, U.S. at 559). By contrast, here the record reflects that when Sanchez worked on NO GAS II,

13

she and the boat would leave the dock at dawn and not return for 11-12 hours. She accompanied the vessel as it travelled on water to various locations. Her job, as well as the vessel's job, was to deploy and retrieve boom on and from the water. And, while this Court does not interpret *Smart Fabricators* as requiring that the plaintiff literally "go to sea,"[11] there is evidence that Sanchez sometimes did. (*See* Sanchez Depo. at 205:4-5 ("Q: . . . [W]as the boat within sight of land or were y'all . . . offshore? A: . . . [W]e were out. We were so far out. You couldn't see the land."). Thus, there is no question that Sanchez's work on NO GAS II was "sea-based" and involved "seagoing activity."

> 2. "(a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?"

AMPOL argues that Sanchez was "a transient oil response technician whose work on NO GAS II was limited to the performance of a discrete task (handling oil boom) after which her connection to the vessel ended." (Reply at 3). The Court does not agree with this characterization.

*Smart Fabricators* explained that "[d]iscrete transient jobs are like the work done by longshoremen when a vessel calls in port. . . . [T]hese workers have only a transitory or sporadic connection to a vessel . . . ." *Id.* at *9 (cleaned up). The classic longshoreman's job is to load or unload cargo from whatever vessel happens to be at the dock where the longshoreman works. Some of Sanchez's work during her first 17 days of employment closely resembles this, as one of her jobs was to load and unload

---

[11] *See id.* at *6 (declining to overturn *Endeavor Marine*'s conclusion that a crane barge operator is a seaman even though the vessel infrequently moved and never left the Mississippi River).

boats that came to the dock at the Venice operations base. (Sanchez Depo. at 174:2 to 175:5). This was a "discrete transient job" that provided only a "transitory or sporadic connection" to the vessels she loaded and unloaded at the dock.

Sanchez's job on the NO GAS II, however, was not "discrete" in the sense that *Smart Fabricators* used that term. During the six days she was assigned to that vessel, her mission and the vessel's mission were the same: deploy and retrieve boom. Wherever the vessel went, Sanchez went. Sanchez's work day and the vessel's work day were co-extensive; only when the vessel completed its booming assignment for the day would Sanchez be returned to shore. And, as discussed earlier, there is evidence to indicate that, but for her injury, Sanchez would have continued working on the NO GAS II until its tour as a Vessel of Opportunity ended. This assignment is unlike the SmartFab crew, who went aboard the offshore rig, performed discrete repairs, and then returned to shore, leaving the rig to continue its mineral exploration mission on the outer continental shelf. *Smart Fabricators*, 2021 WL 1882565, at *8.

To conclude on this factor, Sanchez's assignment to the NO GAS II was not "limited to performance of a discrete task after which [her] connection to the vessel ends." Instead, her assignment "include[d] sailing with the vessel from port to port or location to location." Thus, this factor supports the conclusion that her connection was substantial in nature.

### 3.    "Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?"

*Smart Fabricators* does not discuss this factor in great detail. All it provides is a quote from *Chandris*: "'[With the passage of the LHWCA,] Congress established a

15

clear distinction between land-based and sea-based maritime workers. The latter, who owe their allegiance to a vessel and not solely to a land-based employer, are seamen.'" *Id.* at *7 n.65 (quoting *Chandris,* 515 U.S. at 359)). Note that the phrase "***not solely*** to a land-based employer" is restated by *Smart Fabricators* as "***rather than simply*** to a shoreside employer."

AMPOL did not own the NO GAS II; the Court assumes for purposes of this motion that AMPOL is a "shoreside" or "land-based" employer. There is no doubt that Sanchez, as AMPOL's employee, "owed allegiance" to this company. However, the current record also reflects that Sanchez took orders from the captain (who was not an AMPOL employee) while she was aboard NO GAS II. (*See* Sanchez Depo. at 182:25 – 183:3, 201:19-21, 202:4-10, 205:11-16). It appears the captain's assistant (also not an AMPOL employee) taught Sanchez how to do her job on the vessel (Sanchez Depo. at 187:24-188:12, 190:2-5). And at the end of the day, Sanchez would help clean the vessel. (Sanchez Depo. at 227:21 to 229:1). Thus, the current evidence shows that Sanchez did not owe her allegiance "solely" or "simply" to AMPOL, indicating that her connection to the NO GAS II was substantial in nature.

4.  Perils of the Sea

While *Smart Fabricators* stated that "perils of the sea" is not "the sole or even the primary test," it did not jettison this factor. *Smart Fabricators*, 2020 WL 1882565, at *6 ("While [perils of the sea] is ***one*** of the considerations in the calculus . . . (emphasis added)). At the same time, it is clear that "perils of the sea" is a now minor consideration. *See id.* at *5, *7 (noting that "seaman status is not co-extensive with seamen's risk" and referring to the other factors as "the more definitive inquiries").

Here, Sanchez's work on the NO GAS II regularly exposed her to the perils of the sea. (*See, e.g.*, Sanchez Depo. 201:19-22 ("The weather was really bad. It was raining. The waves were really high. The captain said he didn't care what the weather was, we were going to go do our job no matter how bad the—the waves were or whatever. We were going to fill up with the—the soft boom.")). Accordingly, this factor lends further support to the conclusion that Sanchez's connection was substantial in nature.

* * *

It is not clear entirely clear to this Court if *Smart Fabricators* intended that each of the above factors is necessary—meaning that all must be satisfied in order for a connection to be substantial in nature—or if *Smart Fabricators* intended that they be treated as indicia to be weighed. In any event, all of the factors are present in this case. Therefore, the Court finds that Sanchez's connection to the NO GAS II was substantial in nature. However, because there is a genuine dispute of material fact regarding the "substantial in duration" element, *see supra* Part III(B), seaman status cannot be determined at this stage of the proceeding. Thus, AMPOL is not entitled to summary judgment against Sanchez's Jones Act claim.

### D.     Maintenance and Cure; Unseaworthiness

AMPOL argues it is entitled to summary judgment on Sanchez's claim for maintenance and cure for the same reason it is entitled to summary judgment on Sanchez's Jones Act claim. The Court will deny this aspect of AMPOL's motion for the reasons stated above.

AMPOL also moves for summary judgment on Sanchez's unseaworthiness claim. Sanchez admits that she makes no claim for unseaworthiness against AMPOL.

(Opp'n at 2). Accordingly, the Court will grant AMPOL's motion with respect to this claim.

## IV. CONCLUSION

"The seaman inquiry is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury. Nevertheless, summary judgment . . . is mandated where the facts and the law will reasonably support only one conclusion." *Papai*, 520 U.S. at 554. But, "if reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury." *Chandris*, 515 U.S. at 369. For the reasons explained above, the Court concludes that, on the current evidentiary record, reasonable persons could differ as to whether Sanchez's reassignment to the NO GAS II was sufficient to trigger the "change-of-assignment" exception. Therefore, AMPOL is not entitled to summary judgment on the issue of Sanchez's seaman status. AMPOL is entitled to summary judgment against Sanchez's unseaworthiness claim, as she has abandoned that claim with respect to AMPOL.

Accordingly,

**IT IS ORDERED** that AMPOL's Motion for Summary Judgment (Rec. Doc. 164) is **DENIED IN PART** and **GRANTED IN PART**.

**IT IS FURTHER ORDERED** Sanchez's unseaworthiness claim against AMPOL is **DISMISSED** with prejudice. AMPOL's motion is, in all other respects, **DENIED.**

New Orleans, Louisiana, this 2nd day of June, 2021.

_____
United States District Judge