UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| VICTORIA SANCHEZ | CIVIL ACTION |
| VERSUS | 12-164 |
| AMERICAN POLLUTION CONTROL CORP., ET AL. | SECTION: "J" (2) |

### ORDER & REASONS

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 190)** filed by Defendant BP; an opposition filed by Defendant United States Environmental Services, LLC ("USES") **(Rec. Doc. 195)**; and a reply filed by BP **(Rec. Doc. 199).** Having considered the motion and legal memoranda, the record, and applicable law, the Court finds that the motion should be granted.

### FACTS AND PROCEDURAL BACKGROUND

In this maritime personal injury action, Plaintiff, Victoria Sanchez ("Sanchez") sought to recover for injuries she allegedly sustained while working aboard a vessel in connection with the response and cleanup efforts following the Deepwater Horizon oil spill. In her Fourth Amended Complaint, filed on November 25, 2012, Plaintiff names nine defendants, two of which are BP and USES. (Rec. Doc. 61). Ms. Sanchez alleges that she is a Texas domiciliary and that following the explosion of the Deepwater Horizon and the subsequent oil spill in April of 2010, she was employed by American Pollution Control Corporation ("AMPOL") as a "responder" to the Deepwater Horizon Incident. *Id.* at 4. She further asserts that on or about July 13,

2010, she was working aboard the M/V *No Gas II*, which was performing operations at the direction of all Defendants as part of the "Vessels of Opportunity" program out of Venice, Louisiana in connection with the Deepwater Horizon oil spill response efforts. *Id.* While tending boom, Plaintiff claims she was thrown in the air and injured when she fell back on the vessel. *Id.*

The current motion relates to the crossclaim brought by Defendant BP against Defendant USES. (Rec. Doc. 181). BP alleges that at all pertinent times, there was in full force and effect a Master Service Contract between BP and USES under which USES provided services to BP. *Id.* at 2. Further, pursuant to the Master Service Contract, BP avers that USES agreed to "release, protect, Defend, indemnify and hold harmless" BP from and against Plaintiff. *Id.* at 3. Therefore, BP contends it is entitled to reimbursement of defense costs, attorneys' fees, and contractual indemnity from USES for any liability BP may have to Plaintiff or other parties, as well as any and all personal injuries sustained by Plaintiff. *Id.* BP filed the instant motion against USES seeking summary judgment on its claim against USES and a declaration that BP is entitled to defense and indemnity from USES and its insurers. (Rec. Doc. 190-1).

Subsequently, on September 24, 2021, Plaintiff settled her claims with all of the Defendants. Therefore, the only remaining claims in this case arise from Defendants' crossclaims against each other.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); see *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

## DISCUSSION

### I. THE CONTRACT'S APPLICATION TO THE VESSELS OF OPPORTUNITY PROGRAM AT THE VENICE FACILITY

Because BP's Motion for Summary Judgment seeks a determination of indemnity under the BP/USES Contract, the Court must first determine if the Contract even applies to Plaintiff's claim. BP argues that the alleged injuries of Plaintiff are connected to, and thus fall under, the indemnity clause of the BP/USES Contract. (Rec. Doc. 190-1, at 4). In opposition, USES contends that it was not involved in the Vessels of Opportunity Program in Plaquemines Parish at the Venice Facility. (Rec. Doc. 195, at 2). Any specific work to be performed under the terms of the BP/USES Contract, USES asserts, was to be set out in a work order or work release form. *Id.* USES avers that no such work order or work release was issued for the specific work performed by USES at the Venice Facility in July 2010 when Plaintiff's injury allegedly occurred. *Id.*

To determine if the BP/USES Contract applies to Plaintiff, the Court must analyze the Contract. The Contract in § 3.01 states that

> *[a]ny services performed by [USES] for [BP] that are not governed by another written master service agreement shall be considered as Work performed under this Contract irrespective of whether a written Work Release has been executed.* In this instance, a reference in this Contract to a "Work Release" shall include Work being performed under an oral agreement.

(Rec. Doc. 190-7, at 6) (emphasis added). In consideration of the plain language of § 3.01, the fact that there was no work release or work order governing USES's work at the Venice Facility is immaterial because there is no evidence that another master

4

service agreement controlled the work at the Venice Facility. To support its contention that it was not involved in the Vessels of Opportunity program at the Venice Facility, USES presents the deposition testimony of Duke Lamar Miller, Chief Co-Operating Officer of USES. (Rec. Doc. 195-1, at 2). In his deposition, Miller states that USES was not "running [the Vessels of Opportunity program at Plaquemines]." *Id.* He contends that USES was only "collecting hours of the subcontractors and preparing billing sheets to go back to BP." *Id.* at 3. Miller states that he has "no idea about the actual operations on the ground." *Id.* However, Miller does not state that another master service agreement governed this operation at the Venice Facility, which is the requirement for the BP/USES Contract *not* to govern the work performed at the Venice Facility. He simply states that USES was not "running" the work at the Venice Facility.

On this motion for summary judgment, BP, as the movant, has the burden to "come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). USES can defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265. USES has presented a piecemeal deposition in response to the BP/USES Contract and no evidence of another master service agreement. USES contends that no work release or work order existed for the work performed at the Venice Facility, but per the express language of § 3.01 of the Contract, "[a]ny

5

services performed by [USES] for [BP] that are not governed by another written master service agreement shall be considered as Work performed under this Contract irrespective of whether a written Work Release has been executed." Further, USES avers that it was not involved in the Vessel of Opportunity Program in Plaquemines in one sentence and in the next says it was collecting hours of the subcontractors and preparing billing sheets for BP.

Therefore, USES has not presented sufficient evidence of its own to controvert BP's assertion that the BP/USES Contract applies, and thus the Court finds the BP/USES Contract is controlling.

## II.    GOVERNING LAW OF THE BP/USES CONTRACT

The next step in determining if USES must indemnify BP is ascertaining which law governs the contract. BP argues that maritime law governs, and, therefore, per § 24.02 of the BP/USES Contract,[1] USES has a duty to indemnify BP. (Rec. Doc. 190-1, at 9). In opposition, USES asserts that Louisiana law applies. (Rec. Doc. 195, at 3). USES contends that nothing contained in the BP/USES Contract itself would be maritime in nature, and the terms "vessel" and "offshore" are not even in the Contract. *Id.* The only time the word maritime is used is in § 24.02. *Id.* Moreover, USES argues that Plaintiff's negligence complaint against BP arises out of BP's down hole drilling operations and not out of anything that is maritime in nature. *Id.* at 2–3. Thus, the Contract, USES asserts, does not satisfy either prong of the maritime

---

[1] "To the maximum extent permissible, this Contract, and any action Connected With this Contract brought by either Party (and any action brought by any member of [BP] Group or [USES] Group or any Third Party asserting a third party beneficiary claim pursuant to this Contract) shall be governed by the general maritime laws of the United States."

contract test outlined by the Fifth Circuit in *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018) (*en banc*).

### A. MARITIME LAW AND *IN RE LARRY DOIRON, INC.*

*In re Larry Doiron, Inc.* created a two-prong test to determine if a contract is maritime in nature based upon the principles laid out in *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004). "First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?" *In re Larry Doiron, Inc.*, 879 F.3d at 576. Second, "does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?" *Id.* If the answer to both questions is yes, then the contract is maritime in nature. *Id.* "This test places the focus on the contract and the expectations of the parties." *Id.* When the scope of the contract and the extent to which the parties expect vessels to be involved is unclear, "courts may permit the parties to produce evidence of the work actually performed and the extent of vessel involvement in the job." *Id.* at 577.

The Fifth Circuit, just a year later, extended *Doiron* to non-oil-and-gas contracts in *Barrios v. Centaur, LLC*, 942 F.3d 670, 678 (5th Cir. 2019). "For non-oil-and-gas contracts, *Doiron* would ask whether (1) the contract is 'one to provide services to facilitate [activity] on navigable waters,' and (2) if so, whether 'the contract provide[s] or . . . the parties expect that a vessel will play a substantial role in the completion of the contract.'" *Id.* (*quoting Doiron*, 879 F.3d at 576). The fact that some services are performed on land is not dispositive. *See id.* at 681; *see also Kirby*, 543 U.S. at 27.

First, BP argues that the Contract was one to provide services to facilitate activity on navigable water. BP relies on the language in the Contract requiring insurance when USES is performing work "on, over, or in close proximity to navigable waters or vessels or in any way involves maritime workers." (Rec. Doc. 199, at 5–6 (*quoting* Rec. Doc. 190-7, at 13)). The inclusion of this language seems to anticipate that USES will provide spill response services on navigable waters, and, when it does, additional insurance will be required. Moreover, pursuant to the Clean Water Act, 33 U.S.C. § 1321, operators of offshore facilities are required to have a spill response plan, like the spill response contained in the Contract at issue here. Further, the only waters protected under the Clean Water Act are "[t]he territorial seas and traditional navigable waters; perennial and intermittent tributaries that contribute surface water flow to such waters; certain lakes, ponds, and impoundments of jurisdictional waters; and wetlands adjacent to other jurisdictional waters." Therefore, the BP/USES Contract appears to provide services to facilitate activity on navigable water. Lastly, as the non-movant, USES had the burden of countering with sufficient evidence of its own, which it has failed to do with its singular, conclusory statement that the Contract "would not satisfy either the first or second prong" of the *Doiron* test.

Second, BP asserts that the parties expected that a vessel would play a substantial role in the completion of the Contract. In determining whether there was the substantial involvement of a vessel, "the contracting parties' expectations are central." *In re Crescent Energy Servs., L.L.C. for Exoneration from or Limitation of*

8

*Liab.*, 896 F.3d 350, 359 (5th Cir. 2018). However, when work is performed both on land and in vessels, the court "should consider not only the time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract." *Doiron*, 879 F.3d at 576 n.47. In *In re Crescent Energy Services, LLC*, the court found that the "contract anticipated the constant and substantial use of multiple vessels" when it was known that a vessel "would be necessary as a work platform; that essential equipment would need to remain on that vessel, including a crane; that the most important component of the work, the wireline operation, would be substantially controlled from the barge; and that other incidental uses of the vessel would exist . . . ." 896 F.3d at 361.

Here, the title of the BP/USES Contract is "Spill Response Services," and, thus, the parties anticipated responding to oil spills. (Rec. Doc. 190-7). More specifically, pursuant to Article 3, *Scope of Work*, the work to be performed under the Contract would be more precisely defined in each Work Release. *Id.* at 6.[2] Even though the Contract itself does not expressly anticipate the substantial use of vessels, BP contends that USES nonetheless anticipated executing its oil spill response work using vessels. (Rec. Doc. 199, at 5). USES Corporate Representative Duke Lamar Miller understood that USES was working on the BP oil spill cleaning up, putting out boom, and skimming oil. (Rec. Doc. 199-1, at 2). When there is an oil spill that requires response, Miller stated that USES "would potentially put a little johnboat out there with a couple of people. We would put the boom up; we would contain the

---

[2] "[BP] proposes from time to time to request from [USES] certain Work, as more specifically defined in each Work Release."

9

spill and we would suck the oil off the top of the water and clean it up." *Id.* at 3. Miller went on to state, "[t]hat's how you clean oil spills and stuff." *Id.* Thus, just as the contract in *In re Crescent Energy Services, LLC* anticipated the substantial use of vessels, the BP/USES Contract contemplated the substantial use of vessels because vessels are necessary and essential in responding to maritime oil spills.

Moreover, BP asserts that the terms of the Contract provide further evidence that the parties expected substantial use of vessels. (Rec. Doc. 199, at 5). Specifically, the Contract imposes additional insurance requirements when USES performs its work "on, over, or in close proximity to navigable waters or vessels or in any way involves maritime workers." *Id.* at 5–6 (*quoting* Rec. Doc. 190-7, at 13). In opposition, USES contends the Contract is not maritime in nature because the terms "vessel" and "offshore" are not found in the Contract, and the word maritime is only found once. (Rec. Doc. 195, at 1). Further, USES makes the conclusory statement that the Contract does not satisfy either prong under *Doiron* without further explanation. *Id.* at 2.

BP has put forth evidence that oil spill response work, including the work contemplated by the Contract, contemplates the use of vessels. Miller explained that the only way to clean up a maritime oil spill is with vessels, and the terms of the Contract show that the parties anticipated that vessels would be used. Further, as *In re Doiron* noted, when the contract is unclear as to whether or to what extent the parties anticipated vessel involvement, evidence of the extent of actual vessel involvement may be used to establish this fact. 877 F.3d at 577. Here, there is no

10

debate that vessels were involved in the cleanup from the Deepwater Horizon Oil Spill at the Venice Facility. Moreover, as the non-movant, USES did not put forth sufficient evidence, or any evidence at all, to present a genuine issue of material fact. Therefore, the BP/USES Contract is maritime in nature.

### B. LOUISIANA LAW AND THE LOUISIANA OILFIELD INDEMNITY ACT

Even if the BP/USES Contract is not maritime in nature, and is thus governed by Louisiana law, the indemnity clause is enforceable. USES asserts that because Louisiana law applies, the Louisiana Oilfield Indemnity Act ("LOIA") controls interpretation and execution of the BP/USES Contract. (Rec. Doc. 195, at 3). Specifically, USES avers that LOIA's provision on the nullity of indemnification with respect to death and bodily injury prevents the application of the indemnity clause in the BP/USES Contract. *Id.* at 3–4. However, BP argues that LOIA exempts spill response activities from the scope of its anti-indemnity provisions for death and bodily injury. (Rec. Doc. 199, at 6).

Pursuant to LOIA, "any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee . . ." is null and void as against public policy. La. Stat. Ann. § 9:2780(A). However, LOIA carves out an exception to this anti-indemnity rule for

> loss or liability for damages, or any other expenses, arising out of or resulting from . . . [b]odily injury or death to persons *arising out of or resulting from the retainment of oil spills and clean-up and removal of structural waste subsequent to a wild well*, failure of incidental piping or valves and separators between the well head and the pipelines or failure

of pipelines, so as to protect the safety of the general public and the environment.

*Id.* § 9:2780(F) (emphasis added). A wild well is one "from which the escape of salt water, oil, or gas is unintended and cannot be controlled by the equipment used in normal drilling practices." *Id.* Here, BP contends that because USES was "expressly hired to perform spill response work," the indemnity clause in the Contract is valid under Louisiana law. The Contract was specifically for oil spill response, and thus, it appears to the Court that BP is correct in arguing that LOIA's anti-indemnity provision does not apply to the Contract. Sanchez was allegedly injured while performing spill response activities, and as such, LOIA does not apply to any loss or liability resulting from her bodily injury. Certainly, when there is an oil spill, the escape of the oil or gas is unintended. Moreover, as the extensive *Deepwater Horizon* litigation showed, it could not be controlled by equipment used in normal drilling practices. Therefore, if the BP/USES Contract is not maritime in nature and Louisiana law does, in fact, apply, the indemnity clause will stand.

### III. CONTRACT INTERPRETATION

Finally, the language of the indemnity clause must be interpreted to determine if it truly indemnifies BP. First, the interpretation of a maritime contract is a question of law. *Barrios*, 942 F.3d at 680. "Agreements to indemnify are construed to give effect to the intent of the parties. To determine intent, we look first to the contract language; we only look beyond the language if it is unclear or ambiguous." *Ingalls Shipbuilding v. Fed. Ins. Co.*, 410 F.3d 214, 220 (5th Cir. 2005). As the Fifth Circuit declared in

*Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986) (internal quotations omitted), under federal maritime law,

> [a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.

Here, because the language of the indemnity clause is clear and unambiguous, and USES never argued that it is not, the indemnity clause in the BP/USES Contract releases, protects, defends, indemnifies, and holds harmless BP from and against the personal injury claim brought by Sanchez.

Second, assuming, *arguendo*, that Louisiana law applies to the Contract, "the general rules governing the interpretation of contracts apply in construing a contract of indemnity." *See, e.g., Naquin v. La. Power & Light Co.*, 951 So. 2d 228, 231 (La. App. 1 Cir. 11/17/06). "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. However, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* art. 2046. "The words of a contract must be given their generally prevailing meaning." *Id.* art. 2047. Analyzing the indemnity clause of the BP/USES Contract in light of the above Louisiana contract interpretation articles, the Court finds that the clause clearly provides for USES's indemnity of BP even when there is death or bodily injury resulting from negligence or fault of BP. Moreover, the analysis under Louisiana law is comparable to that under maritime law. Under both maritime and Louisiana law,

13

the court seeks to give the contract the meaning that the parties intended by looking at the language of the contract itself; when the words are clear and explicit, no further analysis is required.[3]

Therefore, under either maritime or Louisiana law the indemnity clause in the BP/USES Contract is enforceable and USES must indemnify BP against Plaintiff's claims.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that BP's *Motion for Summary Judgment* is **GRANTED**.

**IT IS FURTHER ORDERED** that USES is liable for (1) BP's past costs and fees incurred in defending the claims of Plaintiff Sanchez; (2) BP's future costs and fees incurred in defending the claims of Plaintiff Sanchez; (3) all amounts for which BP is or may be liable with respect to the claims of Plaintiff Sanchez; and (4) all costs and fees incurred in seeking defense and indemnity from USES.

New Orleans, Louisiana, this 6th day of October, 2021.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

---

[3] *Compare* maritime law: "[a]greements to indemnify are construed to give effect to the intent of the parties. To determine intent, we look first to the contract language; we only look beyond the language if it is unclear or ambiguous." *Ingalls Shipbuilding v. Fed. Ins. Co.*, 410 F.3d 214, 220 (5th Cir. 2005), *with* Louisiana law: "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. However, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* art. 2046.